37 C.C.P.A.(Patents)
**VARIAN v. LLEWELLYN.**
Patent Appeal No. 5471.

United States Court of Customs and
Patent Appeals.

Dec. 12, 1949.

Rehearing Denied Jan. 31, 1950.

Herbert H. Thompson, Brooklyn, N. Y. (Paul B. Hunter, Brooklyn, N. Y., Victor D. Borst, New York City, and Thomas M. Ferrill, Jr., New York City, of counsel), for appellant.

Henry R. Ashton, M. R. McKenney, and H. A. Burgess, New York City (Harry R. Pugh, Jr., and Guy T. Morris, New York City, of counsel), for appellee.

E. L. Reynolds, Washington, D. C., for Commissioner of Patents as amicus curiae.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, and JOHNSON, Judges, and MILLER, Judge of the United States Court of Appeals for the District of Columbia.

998

JACKSON, Judge.*

Appellant, the junior party to this interference proceeding, appealed from a decision of the Board of Interference Examiners of the United States Patent Office, awarding priority of invention of the subject matter of counts 1, 3 and 4 to appellee. With respect to the remaining counts, 2, 5 and 6, priority was awarded to appellant. No appeal was taken by appellee from that award for the stated reason that those counts were limited to special features of appellant's device.

The appeal came on for hearing and was submitted for decision after argument by counsel for the parties on March 7, 1949. This court rendered its opinion reversing the decision of the Board of Interference Examiners on April 12, 1949.

Subsequently, and within the time allowed by the court, counsel for appellee filed a petition for a rehearing and reconsideration of the appeal. Briefs were filed by the parties and a brief *amicus curiae,* by request of the court, was filed by the Commissioner of Patents. The petition of appellee was granted and oral argument was heard on October 17, 1949.

For the reason that upon further consideration the court is convinced that in its former opinion it erred in its conclusions, and that the decision of the Board of Interference Examiners should have been affirmed, this opinion correcting such error is rendered. Because the former opinion has not been published, it is not necessary to point out the reasons why we now consider the former disposition of the appeal to have been erroneous.

The interference involves a reissue application of appellee, Serial No. 431,607, filed February 19, 1942, for a reissue of his original patent, No. 2,190,668, dated February 20, 1940, upon an application, Serial No. 156,647, filed July 31, 1937, and a patent of appellant, No. 2,242,275, dated May 20, 1941, upon an application filed October 11, 1937.

Originally appeals were taken to this court from three companion decisions of the Board of Interference Examiners, of which the present appeal is one. In two of those, Nos. 5474 and 5475, Varian and one William W. Hansen were appellants and Llewellyn, appellee.

Those interferences were considered in the Patent Office on a common record and appeals from the separate decisions of the Board of Interference Examiners together with said record are before us in a single volume.

The court at the opening of the oral argument entered an order dismissing appeals Nos. 5474 and 5475 in accordance with the request of counsel set out in their brief to withdraw those appeals.

The subject matter involved in the present interference was described by the board as follows: "This interference relates to an electron discharge device adapted to operate at extremely high frequencies as a result of the interaction between an electron stream and a high frequency field whereby the electrons are alternately accelerated and decelerated to form bunches of electrons."

As originally declared the interference involved one count, copied from the patent of appellant as a claim in appellee's reissue application, reading as follows: "1. Apparatus of the character described having, in combination, means for producing a stream of electrons, an internally resonant hollow body having a reentrant pole, and means for projecting the stream of electrons through the space within said body between said reentrant pole and the opposite wall of said body."

Appellant moved to dissolve the interference and appellee filed a motion to add certain other counts copied as claims from appellant's patent. Appellant's motion to dissolve was denied and appellee's motion

* HATFIELD, Judge, being unable to participate in this case because of illness, WILBUR K. MILLER, Judge of the United States Court of Appeals for the District of Columbia, was designated to serve herein pursuant to the provisions of Title 28 United States Code, section 293, 28 U.S.C.A. § 293, effective September 1, 1948.

to add counts was granted so that the interference as redeclared involved counts 1 to 6, inclusive. However, this appeal is concerned only with the aforesaid count 1 and counts 3 and 4, which latter counts read as follows:

"3. Apparatus of the character described having, in combination, means for creating an electron stream, means comprising a space-resonant device for periodically varying the velocity of the electrons of the stream, and means for adjusting the space-resonant device to adjust the period of the periodic variation of the said velocity.

"4. Apparatus of the character described comprising an internally resonant hollow body having a reentrant pole provided with an opening, and a multiple-apertured conducting member closing the opening."

In the motion to dissolve, it was contended that appellee had no right to the single count because the structure defined therein was unpatentable to appellee, in that the claim which constitutes the count is not for the same invention as that which was claimed by appellee during the prosecution of his original patent; that the involved application of appellee was filed an unreasonable length of time after the issuance of his original patent and that no valid excuse therefor was presented; that that broadened claim in appellee's reissue application was not filed within the period of one year from the issuance of his patent, as required for broadened reissued claims, by analogy to the public use statutory bars for the filing of original applications provided for in R.S. § 4886, 35 U.S.C.A. § 31; that appellee did not present a claim corresponding to count 1 until almost three years subsequent to certain named publications which appellant alleged to be references for said claim; that certain patents owned by the assignee of appellee's reissue application are publications barring appellee from obtaining the claim; that the said assignee should have reissued those patents owned by it for the subject matter of count 1, but for the reason that such reissue would be too late that a reissue by either inventor is barred as to the subject matter

of the count and that by the failure to reissue the other owned patents of appellee's assignee, the subject matter of the count is dedicated to the public; and that the count is unpatentable to appellee over the Hansen patent, No. 2,190,712, the filing date of the application for which is alleged by appellant to have preceded the original filing date of appellee.

It was noted in the decision of the Primary Examiner that the reasons relied upon for dissolution were the same as those urged in appellant's motion to dissolve in another interference, No. 80,058, entitled Hahn v. Varian v. Llewellyn in which the Primary Examiner granted Varian's motion to dissolve the interference as to Llewellyn on the ground that the count there in issue read fully on the said Hansen patent, the effective date of which was prior to the record date of appellee and for no other reason. That interference involved the same application of appellee Llewellyn as is here involved.

The examiner in appellant's motion herein stated that it was not supported by convincing argument for reasons which were set forth in his decision in interference No. 80,058. Those reasons the examiner incorporated by reference in his decision on the motion to dissolve in the present interference. He pointed out that the difference between the issue in interference No. 80,058 and the present interference is not great, and is immaterial, and that the matters embraced in the motion to dissolve in this interference were not directed to such difference.

It appears from the decision of the Primary Examiner in interference No. 80,058, that the party Varian contended that the invention of appellee's original patent was directed to a diode oscillator and that the count there in issue did not define an oscillator, but was intended to cover an amplifier. It was admitted, however, that if the count were unduly stretched, at best, it might merely cover a subcombination of some of the modifications of the device of appellee for the reason that the count therein did not recite essential features set out in appellee's original patent. Appellant Varian in that case contended that such

combination could have been, but was not claimed in appellee's original patent, and could have been properly divided therefrom, and furthermore it was contended that appellee disclosed and intended to claim only the diode oscillator in his original patent.

In interference No. 80,058, the Primary Examiner stated that the party Varian contended that the claim in appellee's reissue corresponding to the count therein was for a different invention than the original patent; that the party Varian also alleged that two years less one day was too great a delay for filing a reissue application to broaden the claims of the patent; that delay on the part of appellee in filing his reissue application disclosed such laches as to make the broadened reissue invalid; that nine months delay between the issuance of the Varian patent and the filing of appellee's reissue patent to assert the subject matter therein was fatal.

It may be noted from what has been stated concerning the decision of the Primary Examiner in interference No. 80,058, that the same contentions were made in the motion to dissolve in the present interference.

In interference No. 80,058, the Primary Examiner held that the count there in issue was not for a different invention than that claimed or intended to be claimed in the original patent of appellee, and that the count could have been made as a claim in the application for that patent for the reason that it fully reads thereon and that such claim would have been held to be a subcombination of already claimed matter which would not have been divisible from the subject matter of the other claims then in appellee's patent. The examiner further held in that interference that the claim corresponding to the count was not filed too late in appellee's reissue application because it was filed within two years from the date of issue of the original patent and that no patent or publication, therefore, was pertinent unless it antedated the filing date of appellee's original application.

The examiner stated that the allegations appearing in the reissue affidavit, as showing reasons or excuses for the delay in the filing of the reissue application herein, had been considered and deemed sufficient. The decision of the Primary Examiner in this proceeding incorporating by reference the pertinent reasoning in his decision in Interference No. 80,058, has been examined with scrupulous care, and in our opinion he arrived at the proper conclusion that count 1 herein is fully disclosed in the original application of appellee in that it fully reads thereon, and the claim which constitutes count 1, if presented in the original application, would have been held to be a subcombination of matter already claimed and not divisible from the subject matter of the other claims in the patent.

The Primary Examiner with respect to the last reason given by appellant in his motion to dissolve stated that it required further consideration. In that respect he said that appellant had made no clear application of count 1 to the alleged reference, Hansen patent, 2,190,712, and that it was the contention of appellee that the patent did not disclose the reentrant pole feature of the count. He agreed with the contention of appellee that the patent did not disclose the subject matter of the count, and therefore could not have been a reference.

The Primary Examiner held that appellee could make counts 3 and 4, finding no difficulty in reading count 3 on appellee's Fig. 8 and count 4 on his Fig. 12.

The Board of Interference Examiners considered count 1 to be illustrative of all of the counts in issue here. It held that the testimony presented on behalf of appellee established conception and actual reduction to practice of the invention defined by count 1 in the months of March 1934 and October 1935, respectively, and since such holding had not been seriously disputed that an analysis of such testimony was unnecessary.

The board held that count 1 reads directly upon the device depicted by Fig. 1 of appellee's original application. Moreover, during the oral argument on October 17, 1949, counsel for appellant in answer to questions by the court admitted that count 1 reads upon Fig. 1, as held by the board.

Figs. 1, 8 and 12 appear in both the original patent and in the reissue application of appellee. In fact all the figures in the reissue application are identical with those appearing in the patent.

The board held that there had been no evidence of actual reduction to practice of the devices shown in Figs. 8 and 12, and restricted appellee to his filing date of July 31, 1937, for constructive reduction to practice of the devices defined by counts 3 and 4.

The Board of Interference Examiners in its decision noted the reasons appearing in the brief of counsel for appellant to sustain his contentions as follows:

"Varian urges that Llewellyn cannot prevail in this interference because

"(1) Llewellyn's disclosure fails to support the counts.

"(2) Llewellyn's unreasonable delay in claiming the subject matter of the counts after disclosure of the Klystron to him by Varian bars his right to the counts as against Varian.

"(3) Llewellyn's unreasonable delay in copying claims from the Varian patent after issuance thereof bars his right to the counts.

"(4) Counts 1 to 4 are unpatentable to Llewellyn in view of publications and sale more than two years prior to his first assertion of the subject matter of the counts.

"(5) The counts are not for the same invention as that to which the original Llewellyn patent was direct (sic), and are hence unpatentable to Llewellyn in his reissue application.

"(6) Llewellyn's unreasonable delay in filing his reissue application with broadened claims bars his right to the counts as against the public in general.

"At least the first three of the foregoing grounds are properly arguable at final hearing under Rule 130 as a basis for an award of priority, and if any of such grounds are not presentable as a basis for award of priority, such grounds, together with the last three grounds, are properly arguable here as a basis for a recommendation by

this Board to the Commissioner of Patents under Rule 126."

In disposing of appellant's first contention, the board noted that appellant had made no motion to dissolve based upon appellee's inadequate disclosure as to count 1 during the motion period and also that no adequate reason appeared why such motion had not been brought. The board, therefore, properly refused to consider the matter although if the question of adequate disclosure had been properly raised it was arguable at final hearing under Rule 130, Rules of the Patent Office, 35 U.S.C.A. Appendix. It is clear to us, as was held by the tribunals of the Patent Office, that the claim in the reissue application of appellee corresponding to count 1 was properly presented and that the application of the count to Fig. 1 was correct.

The board thoroughly considered appellant's contention that counts 2 to 6, inclusive, were not disclosed in appellee's application. With respect to count 3, it was stated in the board's decision that counsel for appellant made no specific mention thereof in his brief although he had opposed the admission of the count, alleging lack of adequate disclosure. The board agreed with the decision of the Primary Examiner holding that the count is supported by the original disclosure of appellee. In his decision the examiner stated appellant had admitted that the resonant chamber of the device of appellee "serves to effect some bunching" of electrons and seemingly is a periodic variance of velocity, and that he had therefore impliedly admitted the creation of groups of electrons by such chamber and the taking of energy from those groups, and in view of such admission, all of which in our opinion must include the means to produce such effects, the Primary Examiner held that count 3 reads upon Fig. 8 of appellee's parent application. The examiner stated "The Count does not call for any electrons leaving anything and there is nothing in the count limiting it to an amplifier," which is stated in the specification of appellant's patent to be an object of his invention.

With respect to count 4, the Primary Examiner stated that the whole device of

Fig. 12, appearing in appellee's application must be considered and not merely a section of it. He noted in detail the several elements appearing in Fig. 12 that in his opinion sufficiently supported the terms of the count. One of those elements is a "reentrant pole." Appellant contended before the board and here that Fig. 12 has no reentrant pole in the meaning of the count, but if he disclosed what might be considered to be a pole that it has neither an opening nor a multiple-apertured conducting member closing it. Counsel for appellant contend that a pole is typically cylindrical. In response to such contention, the board pointed out that one of the dictionary definitions of a pole is "An upright standard to the top of which something is affixed or by which something is supported." It held that the examiner did not err in holding that Fig. 12 of appellee discloses the subject matter of count 4.

As hereinbefore mentioned, counsel for appellant admitted that count 1 reads on appellee's Fig. 1. That count provided for a reentrant pole. It appears to us that the device of Fig. 12 is in essence a cylindrical counterpart of that shown in Fig. 1. Fig. 12 shows a member which is directed inwardly into the cavity formed by an outer cylindrical member, although instead of being vertical it is turned 90 degrees. That appellee clearly intended the combination shown in Fig. 12 to be a counterpart of that shown in Fig. 1, we think is evident from the patent specification of appellee, wherein it is stated that "The elements 39 and 40 [Fig. 12], although of a different configuration, are the functional equivalents of * * * the conductors 1, 2, together with the cathode and anode surfaces C, A of Fig. 1."

It appears to us that the inwardly extending rather flat cylinder shown in Fig. 12 is made up of side walls, except that there are four apertures in the closure rim for the through passage of electrons. That the rim is multi-apertured admits of no doubt. Counsel for appellant would have us hold that to be multi-apertured, the element must be screen-like, which is not what the count requires.

The board decided that appellee has established conception of the invention defined in counts 1, 3 and 4 prior to June 5, 1937, which was the date of conception alleged by counsel for appellant in their brief, and that appellee had established reduction of the invention to practice prior to any date alleged by appellee for such reduction, and therefore held that priority of invention as to counts 1, 3 and 4 would be awarded to appellee if the other contentions alleged by counsel for appellant were denied.

One of those contentions is that because of the alleged unreasonable delay in claiming the subject matter of the counts after having knowledge of the device of appellant, that appellee cannot prevail. The board said that that question appeared to be a matter ancillary to priority and could be properly considered by it at final hearing. It then stated it appeared from the testimony on behalf of appellant that the subject matter of counts 1 to 4, inclusive, had been disclosed to an employee of appellee's assignee in June 1939, and further that said assignee had purchased an embodiment of appellant's device, including the subject matter of those counts, which device was delivered to the assignee in January 1940.

The board was of opinion that no estoppel arose from such disclosure for the reason that appellee had been asserting claims to the invention prior to any actual or constructive notice of the device of appellant, which is known as a Klystron. That holding was in harmony with the decision of the Primary Examiner that the involved counts are not for a different invention than that claimed or intended to be claimed in the original patent of appellee.

The board properly stated that during the presentation of his original application, appellee was obviously not claiming the invention in exactly the same language of appellant's patent, but that he was in fact claiming the same invention, and that the involved counts are merely broad subcombination claims of the complete combination claims in the original application,

and that such broader claims would not be divisible from the subject matter of the other claims. Such was the holding of the Primary Examiner, who properly stated that the cases of Ex parte Hans Thoma, 30 U.S.P.Q. 174, and Ex parte McBurney and Nollau, 55 U.S.P.Q. 235, are on all fours with the facts on this phase of the interference.

■ It is clear, as was held by the board, that the claim constituting count 1 herein was copied by appellee less than one year after the issuance of the patent of appellant, and there can be no successful contention, therefore, that Rule 94, Rules of the Patent Office then in effect, is violated with respect to that count. The pertinent part of that rule reads as follows: "No amendment for the first time presenting or asserting a claim which is the same as, or for substantially the same subject matter as, a claim of an issued patent may be made in any application unless such amendment is filed within one year from the date on which said patent was granted."

The claims which are counts 3 and 4 were presented more than one year after the date of appellant's patent. Count 3 was stated by the board to be similar to count 1 except for the addition of "means for adjusting the space-resonant device." The board held that count to be for substantially the same subject matter as count 1, observing the rule does not require that the exact words of the patent be copied within a year, but only that substantially the same subject matter be claimed, which admits of some variation "either in the direction of broader or more specific claims."

With respect to count 4, the board pointed out that in some respects it is broader than count 1, but that it is more specific in the recitation of "a multiple-apertured conducting member closing the opening." The board deemed that the count was for substantially the same subject matter as that contained in count 1.

With respect to reasons 4 to 6, inclusive of appellant's contentions before the board, heretofore set out, it was admitted by counsel for appellant that they are not ancillary to priority. He coupled that admis-sion, as hereinbefore noted, with a request to the board to make a recommendation pursuant to Rule 126, Rules of the Patent Office then in effect, as to the matter raised by those counts. The board in its decision stated that all of the reasons upon which appellant urged the said recommendation, except the evidence of sale to the assignee of appellant, were before the Primary Examiner on motion to dissolve, and that since there was no evidence to establish such sale before the Primary Examiner, it was given no consideration by him.

The board properly stated that the sale of the Klystron under contention 4, above noted, has no more significance than the 1939 publication cited, because it is later in point of time. Finally the board held that all of the other matters which had been urged by appellant for recommendation had been before the Primary Examiner and the board saw no good reason for making such recommendation. The effect of the sale and disclosure of the Klystron to appellee may be properly considered by the Primary Examiner when *ex parte* prosecution of the appellee's application has been resumed.

■ Counsel for appellant in their brief and in oral argument contend most vigorously that because a sale of a Klystron had been made to the assignee of appellee the claims constituting the counts herein should have been presented in appellee's reissue application without delay. We cannot agree to any such contention. Patents are measured by their claims, and appellee had no means of knowing what the claims of appellant might embrace until the patent of appellant issued.

A model of a Klystron was before us during the argument of this appeal. The device disclosed in the drawings of appellee, however, seems quite different in structure from that model. It seems to us that probably the Klystron may be used for purposes that might be foreign to the use of appellee's device.

■ In our opinion the claims of appellant's patent which appear in the involved counts are broad enough to cover not only his device but the device of appellee, and

appellee properly copied such claims to provoke the present interference.

In their contention that appellee's reissue application is for a different invention than that disclosed and claimed in his patent, counsel for appellant point out two deviations from the original application. One of those deviations is that the reissue application relates to "electronic devices," whereas the parent application relates to "oscillators." During the oral argument counsel for appellant admitted that an oscillator is an electronic device. The second deviation is a statement in the reissue application which is not contained in the parent application and reads as follows: "The invention in one aspect contemplates the use of a chamber or cavity resonator excited to set up standing electromagnetic waves of a kind and frequency responsive to the physical configuration of the resonator together with means for causing an electron beam to traverse at least a part of said resonator so as to cause a coaction between said beam and the electric field of said standing waves."

We agree with the tribunals below that such mentioned changes in the reissue application do not render it an application for a different invention than that disclosed in the original application. It may be interesting to observe that the application of appellant is for "Electrical Converters"; the Hahn application is for an "Ultra-Short Wave Device"; and the Hansen et al. application is for an "Electron Beam Oscillator." Thus it will be seen that despite the difference of entitlement of the various applications which appear in the record, the officials in the Patent Office skilled in the electronic art found them sufficiently similar to declare the various interferences referred to herein.

It may be stated that the subject matter of this appeal is of a highly scientific nature and from the record before us we are not able to state that there was manifest error in the concurring opinions of the tribunals of the Patent Office.

It should be noted that the decision of the Board of Interference Examiners is based entirely upon facts as they found them, and we agree with such findings. It is unnecessary, therefore, for us to discuss the many decisions of this and other courts tendered in support of their contentions by the parties. None of the cases cited by appellant are applicable to the facts herein, and it would unduly prolong this lengthy opinion to discuss them.

For the reasons hereinbefore set out, the decision of the Board of Interference Examiners is affirmed.

Affirmed.

JOHNSON, Judge (dissenting).

I dissent. A divided court today is reversing the decision reached previously by an unanimous court. Nothing is found in the majority opinion rendered today to demonstrate the now supposed unsoundness of the original opinion. Persuaded as I am that the court's error today is fundamental, I must, with all due respect to my senior associates, recite my reasons for disagreeing with them.

At the beginning, it is well to consider in detail the nature of the inventions herein involved, for no proper understanding may be reached of fundamental issues raised in this interference without at least an elemental grasp of the technical principles involved.

### The Llewellyn Patent, 2,190,668.

Llewellyn's invention, as disclosed in the patent, relates to "diode oscillators," the principal object of which is to provide a stable frequency oscillator capable of generating waves of the order of ten centimeters and less in length. As stated in the patent, "It has been found that a uniform stream of electrons moving between two equidistant surfaces, * * * exhibits the property of negative resistance within a series of high frequency bands. This property has been used, by applicant, for the production of oscillations at a wave-length of the order of 10 centimeters and is suitable for the production of considerably shorter or longer waves."

Structurally, Llewellyn's invention consists in two electrodes in an evacuated space, both the cathode and anode having

regular, smooth, and relatively flat surfaces, the two surfaces being parallel. The emitting surface of the cathode must be smooth and relatively extensive to secure a required uniform flow of electrons.

Those features, as well as the appropriate relative design of the structure, together with the potentials applied, effect a condition where the transit time of the electrons between the two electrodes is 5, 9, 13, 17, etc., quarter-cycles of the high frequency current sought to be produced. That condition results in a negative resistance which cooperates with the external circuit and the structure to produce a self-excited oscillator.

The space between the electrodes has the characteristics of a circuit which is constituted by a negative resistance and a capacitance in series, the capacitance being a part of a series resonant circuit where the positive resistance is less than the negative resistance of the interelectrode space.

Another form of the invention is a diode oscillator constituted as hereinbefore described except that the stream of electrons is provided by a conventional electron gun, and directed through an opening in the electrode, across the interelectrode space, and toward the anode. There the anode and cathode may have the same potential. In that aspect of the invention, the electrodes may form part of the bounding walls of an inclosed conducting cavity which is dimensioned to resonate at the operating frequency. There, holes in opposing faces of the bounding walls allow the stream of electrons to enter and leave the resonant cavity.

A change in the interelectrode transit time effected by varying the potential applied to the cavity or the electron gun modulates the oscillations produced.

"The output power of the diode oscillator in general," states the patent, "reaches a maximum when the potential applied to the anode is such as to cause the effective transit time to be 1¼, 2¼, 3¼, etc., cycles, as explained above, and falls off or ceases altogether between these values of potential."

The drawings of the patent illustrate eleven species or embodiments of the invention, all of which are described in the patent specification. The patent states further, "In all of these diode oscillators, the output reaches a maximum when the electron transit time is 1¼, 2¼, 3¼, etc. cycles of the high frequency, * * *."

*The Varian Patent, 2,242,275.*

Varian's invention relates to "electrical translating systems and methods," which take the form of oscillating or amplifying tubes, among the objects of which are: (1) to provide in combination a means for producing a stream of electrons, a cavity resonator which will effect the electron stream by concentrating the electrons into groups, and an additional space resonant device which will absorb from the stream of grouped electrons ultra-high frequency energy; (2) to provide an electron discharge tube of high efficiency at ultra-high frequencies, as for example wave lengths of ten centimeters or less; (3) to provide an improved method of abstracting power from an electron stream; and, (4) to provide an ultra-high frequency amplifier employing cavity resonators.

Varian's invention, described as a self-oscillator or converter, and an amplifier, employs as a basic principle in circuit design a "confined field resonator, in the form of a hollow metal internally space-resonant or tuned body." It consists of an envelope or tube with a reentrant stem at one end supporting a thermionic cathode. Electrons emitted from the cathode travel in a stream along a straight-line path toward an accelerating electrode, through it, into and through a cavity resonator, across a space and through a second cavity resonator to an anode at the opposite end of the envelope. The resonators have substantially the shape of a toroid except that the reentrant poles are truncated and do not meet at the center of the resonator. In layman's language, the resonators are metal shells resembling doughnuts, equidistant and parallel screenlike grids being located at the center or hole portion of the doughnut-shaped resonator. The two parallel

1006

grids form the entrant and reentrant means of the first resonator, while the second resonator is equipped with an entrant grid, the anode at the end of the envelope closing the opposite or reentrant position of that resonator in lieu of a second grid.

The resonant alternating electro magnetic fields of the space resonators form standing waves bounded within the conducting walls of the resonators. The interior dimensions of the resonators determine the frequency of the standing waves. The resonators are electrically connected, and the space between them is shielded from the fields within the resonators.

The grids confine the resonator standing fields within the respective resonators. most efficiently to secure the objects of the invention, it is necessary that the grids be spaced so that the electron flight time between them within the resonator is "substantially equal to or less than a half-cycle, or substantially an odd number of half-cycles, in accordance with the initial velocity of the entering electrons, and as determined by the frequency of the space-resonant device."

The alternating electric field set up in the first resonator by the signal results in imparting periodic or cyclic increments and decrements of energy of the period of the field of the resonator to the electrons passing between the grids. When the electrons emerge from the first resonator, some will be traveling at the mean velocity of the stream, some at a velocity higher than the mean, and others at a velocity lower than the mean. These velocities will remain substantially constant while the electrons cross the shielded space between the two resonators. The distance between the departure grid of the first resonator and the entrant grid of the second resonator may be such that the electrons of mean velocity require one, one and a half, or two cycles of the frequency of the accelerating field to cross it. That distance, which the electron stream must cross before entering the second resonator through the grid, is sufficiently large so that the electrons become concentrated in that inter-resonator space into groups or bunches of varying degrees

of concentration with a spacing determined by the frequency of the alternating field and the average velocity of the electrons.

The "bunching" or periodic changes in the electron density of the stream entering the second resonator is used as an energy source, energy being absorbed from the successive concentrations of electrons in the bunched stream and delivered as pulses to an alternating electric field at the field's natural frequency. The groups excite the space-resonant circuit in the second resonator building up and maintaining therein an alternating electric field.

A portion of the energy in the second resonant circuit may be transferred by feed-back to the first resonant circuit by means of a coupling loop in a phase which will enhance the oscillations in the first circuit. That enhancement increases the degree of electron grouping which in turn increases the oscillations in the second resonator. That increase in energy is by feed-back partially returned to the first circuit, etc., and that cyclic process produces stronger and stronger oscillations until a steady state of oscillation results.

Used as an oscillator, Varian's invention is said to be capable of producing great power at wave lengths of the order of ten centimeters or less.

The combination of electron beam and two space-resonant devices is known to the art as a "Klystron."

Before the Board of Interference Examiners, Varian urged that Llewellyn could not prevail in the interference because "(2) Llewellyn's unreasonable delay in claiming the subject matter of the counts after disclosure of the Klystron to him by Varian bars his right to the counts as against Varian." The board held that issue to be ancillary to priority and considered it, but held that estoppel did not exist in this case because "Llewellyn was asserting claim to the invention in issue prior to any actual or constructive notice of the Klystron to him." In support of its decision on the issue raised by Varian's ground (2), the board referred with approval to the examiner's decision wherein it was held that count one "is not for a different invention

than the invention claimed or intended to be claimed by the original Llewellyn patent"; that the count could have been made as a claim in the original application; and that such a claim would have been held to be a subcombination of claimed matter, and not divisible from the claimed matter of the patent. The examiner relied on Ex parte Thoma, 30 U.S.P.Q. 174, and Ex parte McBurney and Nollau, 55 U.S.P.Q. 235, to support his finding. The board concluded its consideration of this ground (2) by holding that the appellee in his original application was claiming substantially the same invention as defined by the counts, and that the present counts "are merely broader subcombination claims of the complete combination claimed in the original application, which broader claims would not have been divisible from the subject matter of the other claims." The majority opinion of the court in treating ground (2) holds that "the cases of Ex parte Hans Thoma, 30 U.S.P.Q. 174, and Ex parte McBurney and Nollau, 55 U.S.P.Q. 235, are on all fours with the facts of this phase of the interference." Since that is the only citation of authority made by the majority regarding the disposition of ground (2), it seems clear that the court today is resting its decision insofar as it reaches ground (2) on two Board of Appeals decisions.

A logical treatment of ground (2), it will be seen, requires a consideration of the following points:

"a. What was the date of actual or constructive notice of the Klystron to Llewellyn?

"b. Was Llewellyn asserting a claim "to the invention in issue" prior to that date? If so, what claim?

"c. Is count one for the same or a different invention than the invention claimed by the original Llewellyn patent?

"d. Is the law, binding on this court, and applicable to the facts of ground (2) expressed in the Board of Appeals decisions, Ex parte Thoma, supra, and Ex parte McBurney and Nollau, supra?"

Those points will be considered in the order stated.

*a. What was the date of actual or constructive notice of the Klystron to Llewellyn?*

In an affidavit of record, it appears that one William T. Cooke, Director of Radio Research, Sperry Gyroscope Co., Inc. (the real party in interest as appellant, whereas the real party in interest as appellee is Bell Telephone Laboratories) was, in 1938, a Special Project Engineer for Sperry Gyroscope Company assigned to Stanford University where he was to "become familiar with the development of ultra high frequency devices" then proceeding at Stanford, and in which appellant was participating. In his affidavit of record, Mr. Cooke stated that he worked at Stanford with the group developing the Klystron tube from September 22, 1938, until April 1939, when Sperry established a separate laboratory at San Carlos "mainly for the purpose of improving the form of the Klystron tube to make it more suitable for production." The group at Stanford, affiant stated, thereafter concentrated on the "more nearly pure research along various lines without the necessity of doing mere engineering development." He further stated that by June 1939 a number of tubes, corresponding generally to the description of appellant's invention, *supra,* had been made; that numerous visitors were contemporaneously received at San Carlos; that among them was Mr. Arthur L. Samuel, a research engineer in the employ of Bell Laboratories, who visited San Carlos on June 27, 1939, to whom Mr. Cooke showed "in detail the manner in which the Model 400 Klystron tubes were constructed"; that Mr. Samuel "was shown parts of these tubes, the manner in which they were assembled, and completed tubes"; that he (Mr. Cooke) also described to Mr. Samuel "the construction of the other forms of Klystron previously built and being developed at Stanford"; and that Mr. Samuel was present at a colloquium of the American Physical Society held at Palo Alto from June 29 through July 1, 1939, at which members of the Klystron group from Stanford "gave talks on the Klystron and demonstrated its construction as embodied in the Models B and C." Mr. Cooke

further stated that the No. 12 tube of the 400 series of Klystrons (a 40 centimeter tube) together with an instruction book entitled "Description of Klystron Model 400" and copies of drawings of the Klystron were sold and delivered to Bell Laboratories through Dr. H. H. Willis, Chief Research Engineer of Sperry in Brooklyn, the same having been shipped via railway express to Dr. Willis from San Carlos on December 17, 1939; and that during a visit with Mr. Samuel at Bell Telephone Laboratories in the summer of 1940, Mr. Cooke saw the No. 12 Model 400 Klystron in Mr. Samuel's laboratory. Mr. Cooke also stated in his affidavit that under similar circumstances he showed resonators and parts and completed tubes of the 10 centimeter Klystron, Model 110, to Dr. John R. Pierce of the Bell Laboratories during Dr. Pierce's visit to the San Carlos laboratory on September 10, 1940. In making that affidavit, Mr. Cooke also introduced into evidence a photostat of the San Carlos visitors' register allegedly bearing Mr. Samuel's signature, a copy of the instruction book and drawings referred to, and a photostat of certain pages of a record book allegedly showing the disposition which had been made of the No. 12 tube of the Model 400 Klystron.

In connection with Mr. Cooke's affidavit, appellant also relies on the affidavit of record of Dr. H. Hugh Willis, Vice President and General Sales Manager of the Sperry Gyroscope Co. Inc., who from November 1937 through January 1940 was Chief Research Engineer for Sperry. Dr. Willis, in his affidavit, stated that he was instrumental in bringing about the association of Stanford University and Sperry Gyroscope Co. under which the latter acquired rights in and furthered the development of the Klystron tube; that, following Mr. Samuel's visit to San Carlos, he (Dr. Willis) received a request from Bell Laboratories to supply them a Klystron tube for experimental use; that he requested Mr. Cooke to send him a 40-centimeter Klystron Model 400 for sale to Bell Laboratories; that the tube, instruction book and drawings were received by him in January 1940; that the same were shipped to Bell Laboratories by truck on January 23, 1940. Dr. Willis, when making his affidavit, introduced into evidence as exhibits a photostat of a purchase order in the amount of $800 received by him from Bell Telephone Laboratories ordering one 40-centimeter Klystron, a photostat of a shipping order of Sperry Gyroscope Co., dated January 23, 1940, showing the shipment of one 40-centimeter Klystron to Bell Laboratories on that date, and a photostat of a letter dated September 11, 1939, received by him from appellee herein, Dr. F. B. Llewellyn.

The letter from Dr. Llewellyn to Dr. Willis is the only exhibit of those mentioned herein which is reproduced in the record. That letter was written by appellee in his capacity as "Chairman of the Session on Ultra-High Frequencies of the Electronics Conference, Institute of Radio Engineers" in regard to "the possibility of having a discussion of recent Klystron developments presented at the forthcoming Electronics Conference of the Institute of Radio Engineers." The letter contains this statement: "The conference is for the purpose of promoting discussion among research workers of the technical aspects of their progress * * * and the principles upon which the Klystron operates are of special interest at this time when a session of the Conference is being devoted entirely to ultra-high frequency developments."

The Board of Interference Examiners considered the evidence reviewed in the preceding paragraphs, and held that although there was no evidence establishing a direct disclosure to Llewellyn, estoppel "could stem from constructive as well as actual notice," adding, "The knowledge of the assignee is imputed to the employee."

It thus appears that in June and July 1939 and September 1940, knowledge and descriptive matter relating to the Klystron was received by Bell Telephone engineers. Furthermore, on their order, a Klystron tube, instruction book, and drawings were shipped to Bell Laboratories in January 1940. Llewellyn himself knew of the Klystron and arranged for a technical discussion of its principles in September 1939.

*b. Was Llewellyn asserting a claim "to the invention in issue" prior to that date? If so, what claim?*

Llewellyn filed the application which eventuated into his patent 2,190,668 on July 31, 1937. The patent issued February 20, 1940. Since his reissue application first presenting count one of this interference was not filed until February 19, 1942, it is clear that if Llewellyn was asserting any claim "to the invention in issue" at the time he received actual or constructive notice of the Klystron (from as early as July 1939 or as late as January 1940) it had to be a claim of his July 31, 1937, application which matured into his patent, No. 2,190,668, on February 20, 1940. Varian's application covering the Klystron was filed October 11, 1937, and matured into patent 2,242,275 on May 20, 1941. Varian's application and Llewellyn's application were therefore copending in the Patent Office for two years, four months and nine days. Had there been any claim in Llewellyn's original application which matured into patent 2,190,668 that covered the "invention in issue," the Klystron, the Patent Office would have been required by R.S. § 4904, 35 U.S.C. § 52, 35 U.S.C.A. § 52, to declare an interference between the copending applications. Patent Office Rule 93, in effect at the time, provided that "An interference is a proceeding instituted for the purpose of determining the question of priority of invention between two or more parties *claiming substantially the same patentable invention * * *."* [Emphasis supplied.] Rule 94, then in effect, is enlightening also. It provides: "Interferences will be declared between applications by different parties for patent or for reissue *when such applications contain claims for substantially the same invention * * *."* [Emphasis supplied.] Rule 96 of that period is likewise helpful: "Whenever the claims of two or more applications differ in phraseology, but relate to *substantially the same patentable subject matter,* the examiner shall suggest to the parties such claims as are necessary to cover the common invention in substantially the same language." [Emphasis supplied.]

Where there was a plain duty, imposed by statute, and by the rules promulgated by the Commissioner of Patents, upon the examining divisions to declare an interference between copending applications directed to substantially the same invention, it is at least inferable that the applications of Varian and Llewellyn, *copending for two years, four months, and nine days,* and never thrown into an interference with each other, were not directed to "substantially the same invention." That inference will be strengthened by what is now to be considered under the third point of this analysis.

*c. Is count one for the same or a different invention than the invention claimed by the original Llewellyn patent?*

It was possible for the original applications of Varian and Llewellyn both to mature into patents because the principles of operation taught in connection with the tube structures disclosed in each were distinct. That they were patentably distinct is inferable from the action of the Patent Office in allowing each to go to issue. Llewellyn's patent specification and claims were distinctly limited, and as limited occupied a domain of their own. The original 29 claims, as contained in the Llewellyn patent, were limited by their terms to (1) a diode oscillator, or (2) a method of generating oscillations; and all of those 29 claims were specifically restricted to the use of (3) an electron transit time exceeding the periodicity of the resonance frequency, or the cycle time of the generated wave, or an integral multiple thereof by one-quarter cycle; or (4) an electron transit time which in relation to the resonance periodicity produces a negative resistance, or the creation of a difference of potential such that a negative resistance exists.

Now, what did Llewellyn do in his reissue application which made it possible for an interference to be provoked between inventions which for more than the two years of their copendency in the Office had been considered patentably distinct? First, by means of his reissue application Llewellyn amended the specification of his

patent to remove well defined limitations *there*. The changes are set out below: (New matter appears in italics in the column to the right.)

has been broadened to remove the express limitations as to "oscillators" and to admit of a resonant chamber and electron beam traversing the same, shorn of limitations as

| *As in the patent specification:* | *As changed in the reissue application:* |
|---|---|
| This invention relates to oscillators | This invention relates to *electronic devices* |
| | *The invention in one aspect contemplates the use of a chamber or cavity resonator excited to set up standing electromagnetic waves of a kind and frequency responsive to the physical configuration of the resonator together with means for causing an electron beam to traverse at least a part of said resonator so as to cause a coaction between said beam and the electric field of said standing waves.* |
| In the broadest aspect of the invention, an electron stream flows through an evacuated region in a conducting cavity which is resonant at the desired frequency, and the electron speed is such that the time which is required for the electrons to traverse the cavity is approximately 1¼, 2¼, 3¼, etc. | In the broadest aspect of the invention, an electron stream flows through an evacuated region in a conducting cavity which is resonant at the desired frequency, and *in its application to diode oscillators* the electron speed is such that the time which is required for the electrons to traverse the cavity is approximately 1¼, 2¼, 3¼, etc. |

The effect of those changes was, *first* to take the invention from the *specific* field of oscillators into the *generic* domain of electronic devices; *second* to introduce *de novo* the concept of a cavity resonator, standing electromagnetic waves responsive to the configuration of the resonator; *third* by restricting the heretofore coextensive limitation of specific electron transit times to what is *now* declared to be but a *species* of a more generic invention, to cast the inference that such transit times are *not* a positive limitation on *all* forms of the invention.

Having broadened the disclosure of his specification, Llewellyn then copied Varian's claim 17, which became count one of the interference. That count contained none of the four limitations embraced in Llewellyn's original 29 claims, and it will be noted from the foregoing analysis of the changes made in the patent specification itself that the scope of the invention to specific transit times or resistance conditions. That the subcombination is an independent invention from the oscillator defined by the patent is shown by the removal of the limitations in the patent which previously limited its use as a part of the combination in the manner described, as well as by the following statement in appellee's Supplemental Oath of February 19, 1942: "* * * the subcombinations in question are capable of use in other fields than that of diode oscillators as measured by the variety of modes in which a coaction may occur between an electric field and an electron beam." Previously, the subcombination was restricted by the terms of the patent and the claims to the mode wherein the coaction was as defined by the limitations (3) and (4) described above. By the terms of the reissue application, the limitations are removed, taking the subcombination out of the restricted use defined in the patent for the combina-

tion, and the subcombination thus defined as a separate entity for the first time, and freed of the limitations of the patent, takes on the dignity of an independent invention, usable not only in the diode oscillator of the patent, but also "in other fields" and in a "variety of modes."

Appellee contends that estoppel does not exist because he was asserting claims to the invention in issue prior to any actual or constructive notice of the Klystron to him. He asserts that the counts are broader than the combination disclosed and claimed in his patent, but insists that because they are not so limited does not make them claims for a different invention. He contends that he is entitled to make the claims to the subcombination by virtue of having claimed the combination. It is clear from the preceding paragraph that despite the findings below and appellee's contentions, he was not asserting claims to the subject matter of count one, separately as a subcombination and shorn of the limitations of his patent specification and claims, prior to his reissue application. Nor do I believe that appellee intended to claim the subcombination separately and apart from the limitations present in his patent. A reading of the specification and claims of the patent reveals Llewellyn's preoccupation with the patentable concept of his diode oscillator and the specific principle of operation recited therein. The amendments offered to the patent specification by the reissue application, as hereinbefore set out, are persuasive that the appellee attempted to broaden the entire scope of his invention by removing the limitations previously restricting the use thereof and asserting claims to a subcombination which lay at the heart of the invention and which now, shorn of limitations, entered "other fields" of use through a "variety of modes."

*d. Is the law, binding on this court, and applicable to the facts of ground (2), expressed in the Board of Appeals decisions Ex parte Thoma, supra, and Ex parte McBurney and Nollau, supra?*

Ex parte Hans Thoma, supra, concerned a reissue application the claims of which had been rejected by the examiner on the ground that the appealed claims covered subject matter different from that covered in the claims of the patent (which were limited to a combination of a fluid pump and a bearing structure). The board pointed out in its decision that *"The application of the original patent clearly brought out* that the subject matter of the invention included this feature of pressure lubrication as well as an oil pump" [Emphasis supplied] and that the patent also stated "that the pressure oil might be supplied from any source so that a pump in the apparatus need not be used." The board held that "The present claims are directed to the oil feed alone, and it is believed that these claims cover a proper combination since it is obvious that such a structure could be used both with a pump built into the rotor or the oil could be supplied under pressure from the outside." The examiner had supported his rejection on the ground that the appealed claims were different from that covered in the claims of the patent, by stating that had claims of the same type been presented during the original prosecution, division would have been required (meaning that from the outset claims of the type of the appealed claims could not have gone to issue in the same patent as those which actually did go to issue in the original patent) because the claims (in the patent) for the general combination of a pump *and* lubricating features constituted the subject matter of a different invention than that involved in the lubricating features alone (the appealed claims). Note carefully what the board held. It did not disagree with the examiner that the combination of the lubricating feature (the oil feed) was a *different* invention than the combination of pump and lubricating feature, but held rather that division would not have been warranted under the doctrine of In re Rundell, 55 F.2d 450, 19 C.C.P.A., Patents, 932. The Rundell case stands for the proposition that where *separate* inventions are correlated, the mere fact that claims are presented in an application which describe *separate* inventions from the other claims of the application, does not justify an involuntary division of them. In con-

sidering whether Ex parte Thoma is any precedent for the court's disposition today of Varian's ground (2), bear in mind these facts. *The original Thoma patent specification clearly described the subject matter of the reissue claims* there; the board did *not* hold that the fact that division of the new combination claims would not have been required under the rule of In re Rundell, supra, took that combination out of the class of a *different* invention than that claimed in the patent. The only conclusion to be drawn from the board's decision there is that, the inventions being correlated, the applicant was entitled to have them both, though patentably distinct, passed upon in the same application. It should be apparent that Ex parte Thoma has nothing to do with determining whether claims in a reissue application are for the same or a different invention than that covered in the original patent, and it is sharply distinguished from the facts of the instant case in that the applicant's patent specification in Ex parte Thoma *clearly described the subject matter of the reissue claims* whereas in the instant case, the Llewellyn patent specification not only did not disclose the subject matter of the reissue claims, but also was distinctly limited in scope so as effectually to exclude any teaching which would support the reissue claims.

In Ex parte and Nollau, supra, a reissue application was filed with claims directed to a collar interliner fabric coated with a certain thermoplastic composition. The examiner rejected the claims on the ground that they were not for the same invention as claimed in the original patent. The Board of Appeals reversed, stating, "it is our view that the present claims represent, in fact, the real substance of the claims of the patent in that the critical feature of the same directed to a collar as a product consists really of the nature of the bonding composition associated with plies of fabric. It appears from the record that claims of the present type would probably have been considered merely a subcombination and allowable along with claims of the type carried by the patent. It is our opinion that the present claims may be regarded patentably as thus relating to the same subject of the invention as the patent claims." It follows from what the board said therein that the subject matter of the reissue claims was disclosed in the original patent specification for the claims could not have been allowed if it were not. It must be repeated here, as outlined above, that Llewellyn did not disclose the subject matter of his reissue claims in his patent specification, and, indeed, it was necessary for him to amend that specification with changes extensive in their effect before he could bring his reissue claims. Furthermore, it by no means follows, as the board in Ex parte McBurney and Nollau seem to assume, that the mere fact that claims directed to a patentable subcombination may be allowed in the same application as claims directed to a combination makes the subcombination the *same* invention as the combination. The express language of In re Rundell, supra, 55 F.2d 450, 19 C.C.P.A., Patents, at page 935-936, belies that assumption, though it is In re Rundell which sanctions the practice described. In re Pedersen, 73 F.2d 928, 930, 22 C.C.P.A., Patents, 788, 792, cites the same proposition: "even though *distinct inventions* may be involved, they may be so closely related that a requirement for division would be improper." [Emphasis supplied.] The court in Re Allatt, 121 F.2d 545, 550, 28 C.C.P.A., Patents, 1367, 1374-1375, in considering the reasons for the second of two requirements for division, said: "It will be seen by reference to the matter quoted above from the ruling of the Examiner of Classification that he said, 'The inventions are *distinct* and *independent* and the fields of search are widely divergent.'" [Emphasis supplied.] As to that the court there held: "We think appellant, by reason of the close relationship of the subject matter of those claims, is entitled to have them considered in a single application." So it by no means follows, as the majority of the court today assumes, that the discretionary allowance by the Patent Office of claims directed to a subcombination in the same application with claims directed to a combination establishes *identity* or *substantial identity* of invention.

In any event, decisions of the Board of Appeals of the Patent Office do not control this court's consideration of issues on appeal here, however informative they may be of contemporary Office practice. It is to the decisions of the courts that we must look for our legal precedents, and the Supreme Court of the United States has considered and answered the problem we have been considering under Varian's ground (2).

In Ives v. Sargent, 119 U.S. 652, 7 S.Ct. 436, 30 L.Ed. 544, the Court had before it a reissue patent, 9901, granted Oct. 18, 1881, on a reissue application filed April 1, 1881, relating to Patent 202,158, filed April 9, 1878. The claims of the original patent had been directed to a combination doorbolt and operating mechanism. The third and fourth claims of the reissue application were directed to a pitman and spring devise, part of the whole combination claimed by the patent. The validity of the reissue patent was attacked on the ground that claims there (three and four) were for a different invention than any described or contained in the original specification. The Court held, 119 U.S. at page 662, 7 S.Ct. at page 441:

"We are also of opinion, however, that the reissue is void on the other ground, viz., that it contains new matter introduced into the specification, and that it is not for the same invention as that described in the original patent. In support of the reissued patent, on this ground, it is contended on the part of the appellant, that the invention of the pitman-spring device is shown in the drawings, which are the same both in the original and the reissued patents. All that can be said in respect to the drawing is that they show the pitman-spring device as a part of the bolt intended to be covered by the patent, and described as a combination of which that device forms a part. There is nothing whatever in the drawings to show that the patentee claimed to be the inventor of that part, separate from the combination, as a distinct novelty, useful by itself, or in any other combination; neither is it so described in the specification. * * * .

"In this view, therefore, the case comes within the rule as stated in Coon v. Wilson, 113 U.S. 268, 277, 5 S.Ct. 537, 28 L.Ed. 963. There, as here, the lapse of time, and laches based upon it, were considered immaterial, because the reissued patent was for a different invention from that described in the original. 'The description had to be changed in the reissue, to warrant the new claims in the reissue. The description in the reissue is not a more clear and satisfactory statement of what is described in the original patent, but is a description of a different thing.' "

The Supreme Court had a similar problem before it in Electric Gas-Lighting Co. v. Boston Electric Co., 139 U.S. 481, at page 501, 11 S.Ct. 586, at page 593, 35 L.Ed. 250, and held:

"The object of the reissue was to prevent the patent from being confined to the apparatus illustrated in the drawings and described in the specification of the original, and to enable it to cover apparatus covered by patents issued subsequently to the original, and especially apparatus covered by patent No. 230,590. The new claims of the reissue are not for the same invention set forth in the claims of the original.

"It is now contended that the invention which Tirrell really made, and which he intended to secure by patent No. 130,770, was the utilizing of one electric circuit both to turn on and to light the gas; but in the description contained in the specification of the original patent there was no statement that the invention consisted in utilizing one electric circuit to do the work of turning on and lighting the gas, which formerly had required two electric circuits, nor was there any claim for such an invention. * * * The invention which Tirrell really made is what he claimed in No. 130,770. What he described in the specification of that patent and did not claim is presumed to have been old."

Again, in Freeman v. Asmus, 145 U.S. 226, 12 S.Ct. 939, 36 L.Ed. 685, the Supreme Court was considering the question of whether the claims presented by a broadened reissue application were for the same

or a different invention claimed or intended to be claimed in the original patent which related to furnaces for smelting iron ore. The Court held, 145 U.S. at pages 238, 239, 12 S.Ct. at page 942:

"The new matter inserted in the specification of the reissue * * * constituted a broader definition on which to found claim 1 of the reissue,—a claim to 'a blast furnace with a closed breast, where the slag is discharged through an opening or openings, cooled by water, substantially as set forth.' * * *

"* * . * There is nothing in the original specification which indicates that any such claim was intended to be made in the original patent. On the contrary, the whole purport of that specification shows that it was intended to claim only a slag-discharge piece or cinder block, constructed and attached in a specific manner, * *.

"* * * there have been numerous decisions in this court which require that the present reissue be held invalid, although it was applied for within less than a year after the granting of the original patent. (Citing cases.)"

In U. S. Industrial Chemicals, Inc., v. Carbide & Carbon Chemicals Corp., 315 U.S. 668, 62 S.Ct. 839, 86 L.Ed. 1105, the Court was considering a reissued patent covering a process for making ethylene oxide. The original patent required in the process claimed the presence of water and air, whereas the reissue application broadened the disclosure and claims of the original by making the presence of water, other than that incidental to the reaction, permissive. The Court held, 315 U.S. at page 675, 62 S.Ct. at page 843, ff:

*"The question is whether, in the light of the disclosures contained in the two patents, they are for the same invention. This court has said that they are if the reissue fully describes and claims the very invention intended to be secured by the original patent; if the reissue describes and claims only those things which were embraced in the invention intended to have to have been secured by the original patent; if the broader claims in the reissue are not merely suggested or indicated in the original specification but constitute parts or portions of the invention which were intended or sought to be covered or secured by the original patent. The required intention does not appear if the additional matter covered by the claims of the reissue is not disclosed in the original patent.* If there be failure of disclosure in the original patent of matter claimed in the reissue, it will not aid the patentee that the new matter covered by the reissue was within his knowledge when he applied for his original patent. *And it is not enough that an invention might have been claimed in the original patent because it was suggested or indicated in the specification. It must appear from the face of the instrument that what is covered by the reissue was intended to have been covered and secured by the original.*

"As the Circuit Court of Appeals held, the original specification and claims treated the voluntary introduction of water into the reaction chamber as a necessary step in the process whereas such introduction is made permissive by the reissue. We agree with that court's view that there is thus a difference between the procedure described in the two documents. * * * *On the face of the papers the process described in the original patent included a . step not designated as optional or desirable but described and claimed as an integral part of the whole operation. In contrast, the reissue treats this step as immaterial * * *.*

"We think it plain that the reissue omitted a step in the process which was described and claimed as essential in the original patent. * * *

* * * * * *

*"This court has uniformly held that the omission from a reissue patent of one of the steps or elements prescribed in the original, thus broadening the claims to cover a new and different combination, renders the reissue void,* even though the result attained is the same as that brought about by following the process claimed in the original patent." [All emphasis supplied.]

This court has followed the foregoing doctrine in the cases of In re Sawyer, 173 F.2d 1004, 36 C.C.P.A., Patents, 1054, 1057;

In re McCoy, 148 F.2d 347, 32 C.C.P.A., Patents, 920, 925. See also In re Frevert et al., 119 F.2d 437, 28 C.C.P.A., Patents, 1128, 1132, and cases cited.

Adverting to the points set forth at the outset of this discussion of Varian's ground (2), it is submitted that it cannot be open to doubt that (a) Llewellyn had notice of the Klystron as early as June or July 1939 or at least by September 1940; (b) Llewellyn was not asserting a claim "to the invention in issue" prior to that date; (c) count one of this interference is not for the same invention as disclosed or claimed by Llewellyn in his original patent; and (d) Ex parte Thoma, and Ex parte McBurney and Nollau, do not support the conclusion of the board—and of the majority of the court today—that count one is for the same and not a different invention than disclosed or claimed by Llewellyn in his original patent. The law as laid down in the controlling decisions of the Supreme Court of the United States, set out at some length above, and followed on other occasions by this court, clearly and unquestionably gives Llewellyn no right whatsoever to the reissue application by which he today is securing from a divided court an award of priority over Varian. And that is true whether or not Varian's intervening rights be considered. However, Llewellyn additionally is not entitled to prevail here, as Varian rightfully contends, because of Llewellyn's unreasonable delay in claiming the subject matter of the interference, if he were indeed the first inventor, after disclosure of the Klystron to him. Let us now go the final step of the way in the analysis of Varian's ground (2).

It is wholly to misconceive the issue to say, as the majority holds today, that "Patents are measured by their claims, and appellee had no means of knowing what the claims of appellant might embrace until the patent of appellant issued." It is not alone knowledge of Varian's *claims* which properly would estop Llewellyn to file his reissue application after unreasonable delay, but, indeed, *it is the knowledge of Varian's invention itself, its structure, uses, and principle of operation which, far more compellingly than knowledge of Varian's claims,* put Llewellyn on notice that rights adverse to his own, if such he rightfully had, were existent and being relied upon. *Llewellyn's patent* neither disclosing nor claiming any interfering subject matter to Varian's invention, which was being developed and exploited publicly, and with the knowledge of Llewellyn and his assignee from *prior* to the issuance of the Llewellyn patent, was no notice to Varian that *he* and *his* invention were imperiled by any adverse rights. Llewellyn could not fail to realize that Varian and Varian's assignee were active in the field developing an invention and disclosing it broadcast to members of the electronics art. To sit idly by as Llewellyn did and observe a competitor develop and exploit an invention which Llewellyn considered his own, for at least two years and twenty-six days after his employer had taken delivery of a Klystron tube, the very embodiment of Varian's invention, or two years, five months and eight days after Llewellyn's letter to Dr. Willis revealing at least a general knowledge of the Klystron tube constitutes laches in and of itself upon which estoppel properly should be founded when Llewellyn comes into an interference thus belatedly seeking to capture or recapture that which he allowed for so long to lie forfeit by the implied disclaimer of the original patent. Even if we prescind from the relationship of the parties created by Llewellyn's early knowledge of the Klystron and his unreasonable delay in asserting whatever rights he considered that he had in the face of the public disclaimer of his patent to the art Varian was developing, the interval of time between the issuance of Varian's patent on May 20, 1941, and the filing by Llewellyn of his reissue application on Feb. 19, 1942, is itself an unreasonable delay in the face of Varian's intervening rights. A period considerably less than this interval of nine months has been held by the Supreme Court to be so unreasonable as to bar the reissue applicant on the ground of laches, as will presently appear.

The reissue statute, derived from the Act of July 3, 1832, c. 162, sec. 3, 4 Stat. 559, has come down to us through the Acts of

July 4, 1836, c. 357, sec. 13, 5 Stat. 117, 122; March 3, 1837, c. 45, sec. 5, 5 Stat. 191, 192; July 8, 1870, c. 230, sec. 53, 16 Stat. 198, 205, and May 24, 1928, c. 730, 45 Stat. 732, R.S. 4916, 35 U.S.C. § 64, 35 U.S.C.A. § 64, virtually unchanged in substance. The Supreme Court, in construing the Act of 1870, held in Gill v. Wells, 22 Wall. 1, 19, 22 L.Ed. 699: "Invalid and inoperative patents may be surrendered and reissued for the same invention, but Congress never intended that a patent which was valid and operative should be reissued merely to afford the patentee an opportunity to expand the exclusive privileges which it secures, to enable him to suppress subsequent improvements which do not conflict with the invention described in the surrendered patent."

Railway Co. v. Sayles, 97 U.S. 554, 24 L.Ed. 1053, involved a patent which issued on an amended application, the amendment having been made by the assignee of the applicant after the original application, considered by the Patent Office to be defective and insufficient, had lain dormant without alteration for five years. The Court examined at length the original application and drawings to determine whether the amended application embodied any addition to or variance from the original. In explaining the necessity for its so doing, the Supreme Court laid down one of the earliest expressions of the law pertaining to reissues where intervening rights are involved. At page 563 of 97 U.S., the Court said: "The law does not permit such enlargements of an original specification, which would interfere with other inventors who have entered the field in the mean time, any more than it does in the case of reissues of patents previously granted. Courts should regard with jealousy and disfavor any attempts to enlarge the scope of an application once filed, or of a patent once granted, the effect of which would be to enable the patentee to appropriate other inventions made prior to such alteration, * * *."

A few years later, the Supreme Court handed down its long since famous opinion in Miller v. Brass Company, 104 U.S. 350, 26 L.Ed. 783. On the subject of broadening the claims of a patent by reissue where intervening rights exist, the Court said, 104 U.S. at pages 355-356:

"Reissues for the enlargement of claims should be the exception and not the rule. And when, if a claim is too narrow,—that is, if it does not contain all that the patentee is entitled to,—the defect is apparent on the face of the patent, and can be discovered as soon as that document is taken out of its envelope and opened, there can be no valid excuse for delay in asking to have it corrected. Every independent inventor, every mechanic, every citizen, is affected by such delay, and by the issue of a new patent with a broader and more comprehensive claim. The granting of a reissue for such a purpose, after an unreasonable delay, is clearly an abuse of the power to grant reissues, and may justly be declared illegal and void. *It will not do for the patentee to wait until other inventors have produced new forms of improvement, and then, with the new light thus acquired, under pretence of inadvertence and mistake, apply for such an enlargement of his claim as to make it embrace these new forms.* * * *

* * * * * *

"But in reference to reissues made for the purpose of enlarging the scope of the patent, the rule of laches should be strictly applied; and no one should be relieved who has slept upon his rights, and has thus led the public to rely on the implied disclaimer involved in the terms of the original patent. *And when this is a matter apparent on the face of the instrument, upon a mere comparison of the original patent with the reissue, it is competent for the courts to decide whether the delay was unreasonable, and whether the reissue was therefor contrary to law and void.*" [Emphasis supplied.]

In Clements v. Odorless Excavating Apparatus Co., 109 U.S. 641, 3 S.Ct. 525, 27 L.Ed. 1060, the Supreme Court had before it reissue patent 6962 issued Feb. 19, 1876, to Keizer, on a reissue application filed Jan. 11, 1876. The Scharf patent, 158,743, issued Jan. 12, 1875—*a year before Keizer's reissue patent was applied for*—and the Frazier patent, 168,473, issued Oct. 5, 1875. —*three months prior to Keizer's reissue*

*application*—were directed to an apparatus quite similar to that covered by the Keizer reissue patent. The Court held, 109 U.S. at page 649, 650: "The suggested mistake in the original patent, that its two claims were not as broad as they might have been made, and that the combinations claimed were too narrow and contained too many elements, and that sub-combinations such as are found in claims 1 and 3 of the reissue might have been claimed in the original patent, in view of the state of the art and of the description and drawings of that patent, was, if a mistake at all, one apparent on the first inspection of that patent. The expansions in claims 1 and 3 of the reissue were afterthoughts, developed by the subsequent course of improvement in the Scharf and Frazier patents, and intended to cover matters appearing in those patents and not claimed in the original patent, No. 115,565. No excuse is given for the delay in applying for the reissue, nor is any actual inadvertence, accident, or mistake shown. The omission to claim sub-combinations in the combinations claimed, the existence of such sub-combinations being apparent on the face of the original patent, was, in law, on the facts in this case, such a dedication of them, if new, to the public, that a reissue, to cover such sub-combinations, in revocation of such dedication, cannot be availed of to the prejudice of rights acquired by the public to what is shown in the Scharf and Frazier patents, issued before the reissue was applied for."

The doctrine of the Clements case, supra, was applied with special emphasis by the Court in Torrent & Arms Lumber Co. v. Rodgers, 112 U.S. 659, 5 S.Ct. 501, 28 L.Ed. 842. That case involved Esau Tarrant's reissue patent dated July 15, 1873, on an application dated June 25, 1873, and the patent of John Torrent, issued Aug. 12, 1873, on an application filed Jan. 29, 1873. The specification of Esau Tarrant's patent was changed so as to enlarge the scope of the patent. The claims of the original patent were directed to a combination, but the reissue application added a claim for an element of the combination "segregated from the combination and claimed as a distinct invention of the patentee" concerning

which the Court held, 112 U.S. at page 669, 5 S.Ct. at page 507: "We find, therefore, that the specification and first claim of the reissue was an enlargement of the claims of the original patent, and covered an invention not covered or described therein; that *the reissue was not applied for* until nearly five years after the date of the original patent, and not *until another inventor had made a substantial advance in the art to which the original patent belonged, which the assignee of the original invention, it may be fairly inferred, desired to include in the monopoly of his patent, and that he sought to accomplish this by its reissue. The first claim of the reissued patent was therefore void.*" [Emphasis supplied.]

In Coon v. Wilson, 113 U.S. 268, 5 S.Ct. 537, 541, 28 L.Ed. 963, the patentee applied for a reissue of his patent, relating to an improved collar, *within three months of its issue,* because, as the Court said, "the defendants' collar, with a continuous band, had been put on the market, and for the purpose of obtaining claims which would certainly cover such a collar." The Court held, 113 U.S. at page 277, 5 S.Ct. at page 541:

"Although this reissue was applied for a little over three months after the original patent was granted, the case is one where it is sought merely to enlarge the claim of the original patent, * * * and where it is apparent, from a comparison of the two patents, that the reissue was made to enlarge the scope of the original. As the rule is expressed in the recent case of Mahn v. Harwood, 112 U.S. 354, [6 S.Ct. 451, 28 L.Ed. 665], a patent 'cannot be lawfully refused for the mere purpose of enlarging the claim, unless there has been a clear mistake, inadvertently committed, in the wording of the claim, and the application for a reissue is made within a reasonably short period after the original patent was granted.' * * * In the present case there was no mistake in the wording of the claim of the original patent. * * * The description had to be changed in the reissue, to warrant the new claims in the reissue."

In Topliff v. Topliff, 145 U.S. 156, at page 171, 12 S.Ct. 825, at page 831, 36 L.Ed.

658, in discussing the right of a patentee to a broadened reissue, the Supreme Court said: "Under such circumstances, it would be manifestly unjust to deny him the benefit of a reissue to secure to him his actual invention, provided it is evident that there has been a mistake, and he has been guilty of no want of reasonable diligence in discovering it, *and no third persons have in the mean time acquired the right to manufacture or sell what he had failed to claim.*" [Emphasis supplied.]

Huber v. N. O. Nelson Manufacturing Co., 148 U.S. 270, 13 S.Ct. 603, 37 L.Ed. 447, involved Boyle's reissued patent, 10,826, granted April 19, 1887, on a reissue application *filed Jan. 2, 1885,* and Hanson's patent, No. 308,358, *issued Nov. 25, 1884,* on an application filed June 12, 1883. Although *less than two months* intervened the grant of Hanson's patent and Boyle's reissue application, the Court held, 148 U.S. at page 292, 13 S.Ct. at page 610: "It was not until Boyle obtained knowledge of the Hanson patent that he conceived the idea of claiming such a construction as had been patented to Hanson. Then, and not until then, he announced, the idea that it was of value to do away with the flushing chamber, although the specification of his original patent, in its text and drawings and claims, emphasized the importance of the flushing chamber as an element in every one of his combinations. * * * There is nothing in the original patent which suggests any such combination as is claimed in claims 1, 2, and 4 of the reissue, or which suggests the possibility that Boyle's invention could be operated by a combination which omitted the flushing chamber as an element thereof. *Every one of the elements which is made a part of the several combinations claimed in the original patent is thereby made material to such combinations.*" [Emphasis supplied.]

In Sontag Chain Stores Co., Ltd., v. National Nut Co. of Calif., 310 U.S. 281, 60 S.Ct. 961, 84 L.Ed. 1204, the Supreme Court had before it the issue of what effect a broadened reissue claim has upon the use of a machine manufactured and operated after the original patent issued—and without infringing it—but which is dominated by the broadened claim of the reissue patent. There the respondent's original patent issued with narrow claims on May 15, 1934. Petitioner procured the accused machine on April 1, 1935, from a manufacturer who had been making the machines at least since August 1934. Petitioner first gained actual knowledge of the patent in October 8, 1935, when respondent brought an infringement by use action against him. That was denied. January 15, 1936, respondent applied for, and on June 30, 1936, obtained a reissue patent with broadened claims embracing petitioner's machine. A second infringement proceeding was brought which ultimately came before the Supreme Court on certiorari. Mr. Justice McReynolds there reviewed the precedents in reissue cases since the earliest case, Grant v. Raymond, 6 Pet. 218, 8 L.Ed. 376, in response to which the Patent Act of 1832, supra, was enacted to provide for reissue patents. With regard to the facts before him, so analogous to the facts herein, Mr. Justice McReynolds said, 310 U.S. at page 293, 60 S.Ct. at page 967, 84 L.Ed. 1204:

"In the case under consideration the patentee might have included in the application for the original patent, claims broad enough to embrace petitioner's accused machine, but did not. This 'gave the public to understand' that whatever was not claimed 'did not come within his patent and might rightfully be made by anyone.' The enlarged claims were presented with knowledge of the accused machine and definite purpose to include it.

*"Recapture within two years of what a patentee dedicates to the public through omission is permissible under specified conditions, but not, we think, 'at the expense of innocent parties.' Otherwise, the door is open for gross injustice to alert inventors and baffling uncertainty will hinder orderly development of useful arts.*

"The District Court properly ruled that petitioner had 'acquired intervening rights which in equity plaintiff * * * might not now disturb.'" [Emphasis supplied.]

The foregoing cases have been set out at some length to show that the Supreme Court of the United States has distinctly

and clearly declared reissued patents null and void where they were sought and obtained, in the presence of intervening rights, so as to dominate inventions developed and patented by others in reliance upon the implied disclaimer of a patent narrowly drawn. The time interval following the issue of the patentee's original patent and the filing of the reissue application has been as slight as two and three months. Yet where there was absent a clear manifestation of the patentee's intention to claim in the original patent the subject matter now sought to be secured by means of a reissue, where there are intervening rights, and where changes must be made in the patent specification to accommodate the reissue claims, the reissue may not be allowed. If under the conditions recited above, a reissued patent is, as the Supreme Court has held, void, it is void ab initio. This court, faced with equivalent circumstances in an interference proceeding, should not give to a reissue application which would be void in the supreme contest as a patent, any greater effect in a contest of priority. For, here as there, the one seeking to assault the bona fide intervening rights of another should not be allowed to extinguish the rights of one who has pursued, captured, and disclosed to the public that which the other may have known but failed to reserve in his own patent. He should not be permitted to prevail here to the detriment of one who has independently established his right to the art which the other might have secured mayhaps but publicly disavowed by a narrow patent until knowledge of the development trod upon but unnoticed until his adversary informs him of its presence, sends him belatedly into the Patent Office seeking a reissue. Where, as here, appellant has established by uncontradicted evidence that appellee had knowledge of appellant's invention, where it is apparent that appellee did not claim or intend to claim the subject matter of appellant's invention, where the entire theory of appellee's patent emphasizes a preoccupation with a limited concept of his invention excluding a realization of the independently useful and patentable nature of a subcombination thereof, where appellee delays more than two years to assert his rights in the face of the knowledge of appellant's invention embracing matter which appellee believes he might have claimed and reserved for himself by timely action, we should not hesitate to ascribe laches to the appellee and estop him from asserting priority of invention.

Turning now to the "technical issue" of this interference, I express firm disagreement with the majority who hold today that "the subject matter of this appeal is of a highly scientific nature and from the record before us we are not able to state that there was manifest error in the concurring opinions of the tribunals of the Patent Office." When the original opinion herein was handed down on April 12, 1949, not only the majority, but an unanimous court was able to state and did state that manifest error had been committed by the Patent Office tribunals on the technical question.

Before the board, Varian's ground (1) was that "Llewellyn's disclosure fails to support the counts." The board, as to that, held that the Llewellyn patent disclosed the subject matter of counts 1, 3, and 4. In his reasons of appeal to this court, Varian assigned that holding as error, and contended that Llewellyn fails to disclose the subject matter of count 4. In his motion to add counts, October 7, 1942, Llewellyn said that count 4 (then count XII) may be applied to his Figure 12 species in a certain manner, detailing it (which is analyzed *infra*). In its original opinion herein, the court demonstrated that the application by Llewellyn of the terms of count four to his Figure 12 species did not establish disclosure. We held that his Figure 12 species did not "read upon the count." The explanation made by Llewellyn in his motion to add counts is, of course, the only explanation of record, apart from the matter commenting thereon in the decisions of the tribunals below. When the cause came on for rehearing, counsel for Llewellyn was asked to explain to the court the application of the terms of count 4 to his Figure 12 species appearing *of record* in the motion to add counts. He replied, "That is a mistake," adding that it was a mistake made by "the patent solicitor" who handled the case for Llewellyn before the Office. The unwillingness of

the appellee's counsel to adhere to the only explanation of the application of Llewellyn's Figure 12 species to the terms of count 4 is, of course, a disavowal of its applicability—which an unanimous court independently held to be inapplicable in the original opinion. It should require no citation of authority to point out that the only matters before the court for consideration are those appearing of record properly identified by reasons of appeal. The decision of the examiner and board, it must be noted, was rendered upon the matter *of record* pertaining to this issue, and it is that decision we are presumably considering on this appeal. The analysis of Varian's contention that Llewellyn fails to disclose the subject matter of count 4 is presented now, stated in the language of the court's original opinion.

Count 4 by its terms requires the following elements:

"A. An internally resonant hollow body;

"B. Having a reentrant pole provided with an opening; and

"C. A multiple-apertured conducting member closing the opening."

In his motion to add counts, dated October 7, 1942, Llewellyn said that count 4 (then Count XII) may be applied to Figure 12 of his patent, as follows (the matter appearing in quotation marks is taken from Llewellyn's motion to add counts, appearing of record):

(a) "the 'internally resonant hollow body' is the member 40": the drawing of Figure 12 clearly indicates that member 40 is an internally resonant hollow body; there is no dispute as to that element.

(b) "the reentrant pole" is the cylindrical surface of cylinder 39, the opening is that which is closed by the outer cylindrical wall of number 39": the specification of the Llewellyn patent refers to the electrons being "focussed * * * so as to pass through the resonant cavity between the conducting elements 39 and 40 by entering and leaving respectively through the aligned slots in said elements 39 and 40 * * *." Before the examiner, the appellant contended that count 4 (then Count XII) as claim 18 of the Varian patent referred to the doughnut-shaped space-reson-

ant device with the grid (described supra), and could not be read on Llewellyn's Figure 12 as to do so would require a strained interpretation with the element 39 serving both as the "reentrant pole * * * with an opening" as well as the "multiple-apertured conducting member closing the opening."

(c) "the 'multiple-apertured conducting member closing the opening' is the outer cylindrical wall with its four slots 33": the Figure 12 drawing in the Llewellyn patent shows that the slots 33 are slots in the cylindrical surface of the cylinder 39. Therefore, the "wall with its four slots" could be no other member in Figure 12 than the cylindrical surface of cylinder 39. The appellee has already allocated that surface to serve as the "reentrant pole provided with an opening" and it would do violence to logic and reason to assign the same member as the element "a multiple-apertured conducting member closing the opening" because the opening to be closed is the opening in the reentrant pole. The cylindrical surface of member 39 cannot at one and the same time be the reentrant pole *with an opening* as well as a multiple-apertured member *closing the opening.*

The Primary Examiner held, "the whole device of Llewellyn's Fig. 12 must be taken and not a section thereof. However the cylinders 34, 40, 39 and the smaller cylinders inside cylinder 40 fully support the terms of this count, the reentrant pole comprising element 39" The examiner makes no further explanation. Now cylindrical member 34 encircles cylindrical body 40; the body or member 40 encloses the cylindrical member 39. If 39 be regarded as the reentrant pole provided with an opening (where, as appellee assigns, the reentrant pole is the cylindrical surface of cylinder 39), by the limitations of the count, "closing the opening" must be "a multiple-apertured conducting member." But the cylindrical wall of member 39 with its slots 33 does not itself close the very slots in its surface.

Before the Board of Interference Examiners, Varian contended as he did before the Primary Examiner, that if Figure 12 of Llewellyn's patent did have what might be considered a reentrant pole, it does not

have an opening and a multiple-apertured conducting member closing it. The board in regard to this argument held,

"While the dictionary definition quoted by Varian states that a pole is typically cylindrical, it is not necessarily cylindrical. One definition given is 'An upright standard to the top of which something is affixed or by which something is supported.'

"In view of this definition, we do not believe that the primary examiner was in error in holding that Fig. 12 of Llewellyn discloses the subject matter of count 4."

The board did not describe wherein the definition meets the difficulty noted above in Llewellyn's application of the limitations of the count to his Figure 12 species. The appellant contends before us that the board used a completely inapplicable definition of the term pole, but even by its terms Llewellyn's structure does not meet the count, as it is in no way an upright standard, but rather an arrangement of cylinders, one enlarged upon another.

Appellee contends before us that the second element of the count ("a reentrant pole provided with an opening") is "Reentrant pole 39, the opening in which is closed by the outer cylindrical wall of member 39." But in the specification of his patent Llewellyn identifies 39 as one of the "conducting elements," electrons entering and leaving the resonant cavity between elements 39 and 40 through aligned *slots in said elements.* Again the specification states, "a feature of the modification illustrated by Fig. 12 * * * is the extension of *the slotted elements 39, 40* * * *." The drawing of Figure 12 clearly shows the designation "39" applied to the cylindrical wall. In his motion to add counts, Llewellyn applied the terms of the count to his Figure 12 stating that "the 'reentrant pole' is the cylindrical surface of cylinder 39 * * *."

We held in the original opinion, and I still believe, that the clear meaning of "reentrant pole provided with an opening" is a reentrant pole *provided with a passage, breath, or gap* (opening), and the cylindrical surface or wall of cylinder 39 which appellee assigns as the "reentrant pole," in enclosing an *inner space* does not answer the limitation of the count of a reentrant pole provided with an *opening*. The opening must be in the surface if the surface is assigned as the reentrant pole. While the appellee before us assigned "Reentrant pole 39, the opening in which [appellee in his motion to add counts before the examiner identified the reentrant pole as the cylindrical *surface* of the cylinder 39, but changed his position to the extent quoted in his brief on appeal here] is closed by the outer cylindrical wall of member 39," to element B of the count, supra, that position is clearly inconsistent with the limitations in the count, and in view of the analysis hereinbefore set forth, cannot be allowed where logic and reason prevail. The appellee developed his position somewhat in his brief on appeal, quoting from the concurring decisions of the tribunals below, and citing Stern et al. v. Schroeder et al., 36 F.2d 518, 17 C.C.P.A., Patents, 690; Daley v. Trube, 88 F.2d 308, 24 C.C.P.A., Patents, 964, 971; and, Mantz v. Jackson, 140 F.2d 161, 31 C.C.P.A., Patents, 824, 830, to the effect generally that where there are concurring findings involving highly technical matters by the Patent Office tribunals, the decision appealed from will not be disturbed here without a clear showing by appellant that the findings below are erroneous. Appellee also cites Paris v. Burke, 52 App.D.C. 69, 281 F. 429, setting out in his brief language quoted by the court therein from the decision of the Examiners in Chief to the effect that the inventions in issue there were essentially the same, and it was immaterial whether they are described in the same or different terminology. It is sufficient to say that the point in issue here as to count 4 is not whether the same or different terminology is a matter of any moment, but whether, in whatever language used, Llewellyn's disclosure reads on count 4. To reinforce his argument in this latter regard, appellee cites Malm et al. v. Schneider, 101 F.2d 201, 26 C.C.P.A., Patents, 783, 786, to the effect that in an interference proceeding counts are to be given the broadest interpretation which their language reasonably will permit. Here, however, count 4 contains three elements with two distinct limitations: the reentrant pole *with its opening,* and the

multiple-apertured conducting member closing *that opening*. Appellee's Figure 12 species does not meet those limitations, as outlined in the preceding paragraphs of this dissenting opinion. Malm et al. v. Schneider, supra, also expresses the limitation to the rule relied on by appellee, and that limitation is controlling in cases similar to this; viz., express limitations in a count are material and may not be disregarded. Saklatwalla v. Marburg, 172 F.2d 227, 36 C.C.P.A., Patents, 791, and cases there cited.

It is correct, as appellee states in citing Stern et al, v. Schroeder et al., Daley v. Trube, and Mantz v. Jackson, supra, that where there are concurring findings by the Patent Office tribunals on a question of fact, this court will not disturb those findings unless there is manifest error. This rule has been particularly applied where the concurrent findings concern highly technical matters; however, as stated in the case of In re Christmann et al., 107 F.2d 607, 27 C.C.P.A., Patents, 708, the court will—and should—not hesitate to reverse the tribunals below on concurring findings where it seems proper to do so. After a careful analysis of the technical issue, I can in conscience adhere to no conclusion other than that the Patent Office tribunals are manifestly in error in holding that Llewellyn's Figure 12 species discloses the invention claimed in count 4, and I have searched the majority opinion in vain for a square holding there that Figure 12 reads upon the count. The majority state undeniably enough "That the rim is multi-apertured admits of no doubt." That fact was set out in the original opinion. The majority fails to identify where in Figure 12 "a reentrant pole provided with an opening" is disclosed, and it will not quiet candid inquiry into the application of Figure 12 to the well defined limitations in the count to notice that "the rim is multi-apertured," without identifying *all* of the limitations present in the count. The majority concludes that because appellant admits that *count one* reads on appellee's *Figure 1,* that count four reads on Figure 12, because "Figure 12 is in essence a cylindrical counterpart" of Figure 1. It has never been demonstrated, nor

does it appear of record that Figure 1 reads on count 4, and the terms of count 1, upon which appellant concedes Figure 1 reads — and that is as far as his concession goes — do not embrace certain of the limitations of count 4. So it proves nothing to compare Figure 12 with Figure 1. Count one and count four are quoted below.

"1. Apparatus of the character described having, in combination, means for producing a stream of electrons, an internally resonant hollow body having a reentrant pole, and means for projecting the stream of electrons through the space within said body between said reentrant pole and the opposite wall of said body.

"4. Apparatus of the character described comprising an internally resonant hollow body having *a reentrant pole provided with an opening,* and *a multiple-apertured conducting member closing the opening."* [Emphasis supplied.]

Attention is again invited to the express limitations in count 4, italicized above, which do not appear in count 1. As the court affirmed in Saklatwalla v. Marburg, supra, express limitations in a count may not be ignored. As demonstrated by the court in its original opinion—as recited above—Llewellyn's Figure 12 species clearly does not read on the terms of count 4.

Finally, on the "technical side," the majority does not consider it a "deviation" in the original Llewellyn patent specification to change the wording there from "oscillators" to "electronic devices" (see the parallel column comparison of the patent specification with the reissue specification above) because "During the oral argument counsel for appellant admitted that an oscillator is an electronic device." That every oscillator is an electronic device is true, but it violates elemental principles of logic to say that therefore every electronic device is an oscillator. A species is not coextensive with its genus. It is precisely because Llewellyn broadened his patent specification from an express limitation to a single species—oscillators—to encompass the entire genus — electronic devices — that Varian urged that the reissue application was no longer directed to the *same* in-

vention as that disclosed and claimed in the patent. In my judgment that contention is well founded.

The last point to be treated in this dissent is that to which the brief *amicus curiae* of the Commissioner of Patents was directed. The court's original opinion left the regrettable inference that the mere interval of time between the issuance of a patent and the filing of a reissue application constituted such a hiatus as would deny to the reissue application the filing date of the original patent application as a constructive reduction to practice. Such a proposition is, of course, unsupportable. What the court intended to say, and did not, in the original opinion is that a reissue applicant who has failed to meet the requirements of the reissue statute, by failing to disclose any intention in his original application to claim the subject matter subsequently presented by his reissue application claims, and by inserting new matter into the reissue specification, is not entitled to his original filing date as a constructive reduction to practice.

This issue of law arose in connection with count 3, first presented by Llewellyn as claim 73 in an amendment dated October 7, 1942, to his reissue application of February 19, 1942. If count 3 was directed to the same invention claimed or intended to be claimed by Llewellyn in his original application, it would receive the filing date of the original patent application, July 31, 1937, as a constructive reduction to practice. Otherwise, it should not.

The reissue statute, 35 U.S.C. § 64, 35 U.S.C.A. § 64, provides that "the reissued patent to the extent that its claims are identical with the original patent shall constitute a continuation thereof and have effect continuously from the date of the original patent." The statute also requires, "no new matter shall be introduced into the specification." As this court said in Morgan v. Drake et al., 36 F.2d 511, 513, 17 C.C.P.A., Patents, 729, in construing the reissue statute: "The subject-matter of the interference count must clearly have been disclosed in the patent upon which the reissue application is based, and *it must clearly appear that the reissue applicant sought to secure protection of this particular subject-matter in his original application, just as he seeks it in the reissue application."* [Emphasis supplied.] The norms for ascertaining the requisite intention have been laid down by the Supreme Court in the cases reviewed above, culminating in U. S. Industrial Chemicals, Inc., v. Carbide & Carbon Chemicals Corp., supra. Where the reissue application contains new matter not found in the original patent application this court has held in Kollsman v. Carbonara, 88 F.2d 966, 24 C.C.P.A., Patents, 1149, that the reissue applicant may not rely upon his original patent as a basis of an award of priority upon the invention embraced in the involved counts. Where in an interference proceeding, the determination of the issue of priority rests upon the date to which each party is entitled as a constructive reduction to practice, this court must, in my judgment, where one of the parties is a reissue applicant, examine as ancillary to priority where it has been timely raised the issue of whether the reissue applicant is entitled to the filing date of his original patent application as a constructive reduction to practice. In to doing, it must, logically, be free to examine the related issue of whether the claims of the reissue application are directed to the same invention as that claimed or intended to be claimed in the original patent, the views of the Commissioner of Patents notwithstanding. Failure to examine such an issue, where properly raised here and below by a party, would, where the award of priority would otherwise turn on entitlement of the reissue applicant to his patent application filing date as a constructive reduction to practice, deny the interference adversary of the reissue applicant of a clear substantive right, and make of the interference proceeding before this court an artificial and insubstantial determination of rights.

Because the decisions of the Patent Office tribunals are, in my judgment, clearly erroneous, and because of the great interest and patience which has been displayed by the parties, the Commissioner of Patents, and by the court itself in reaching a proper decision of this interference, I felt constrained to set forth my views at some length, feeling as I do that manifest error and consequent injustice attend upon the decision of the majority today.