## MANTZ v. JACKSON.
### Patent Appeals No. 4782.

Court of Customs and Patent Appeals.
Jan. 3, 1944.

Brown, Jackson, Boettcher & Dienner, of Chicago, Ill. (Charles V. Hildebrecht, Arthur H. Boettcher, and Henry H. Babcock, all of Chicago, Ill., of counsel), for appellant.

Stebbins & Blenko, of Pittsburg, Pa., and Smith, Michael & Gardiner, of Washington, D. C. (William H. Webb, of Washington, D. C., of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

BLAND, Associate Judge.

This is an appeal from the decision of the Board of Interference Examiners of the United States Patent Office in an interference proceeding involving a patent, No. 2,213,844, to Harold A. Mantz, granted September 3, 1940, on an application filed November 10, 1938, and an application of Wilbur F. Jackson filed February 7, 1941, for reissue of his patent No. 2,201,399, granted May 21, 1940, on an application filed January 7, 1938. Jackson, therefore, is the senior party.

As originally declared, the interference comprised five counts corresponding to five claims in the Mantz patent, which Jackson copied into his application for reissue. Mantz, in response to an order to show cause why judgment on the record should not be entered against him, moved to dissolve the interference as to counts 1, 2, and 5 on the ground that Jackson's disclosure did not support them. The Primary Examiner granted the motion as to count 5 but denied it as to counts 1 and 2.

On final hearing, the Board of Interference Examiners reviewed the question as to Jackson's right to make counts 1 and 2 and, holding that these counts were supported by Jackson's disclosure, awarded priority to Jackson. Jackson's record date being earlier than that of Mantz, judgment of priority was entered in favor of Jackson as to counts 1 to 4, inclusive.

The only issue before this court is with respect to Jackson's right to make counts 1 and 2, although appellant has advanced another contention to which we shall refer hereinafter.

Counts 1 and 2 read as follows:

"1. In a device of the character described, in combination, a control device having an electromagnet provided with an armature connected to *a controlling member* and adapted when energized to hold said member in operating position and when deenergized to release said member for movement to a safety position, a shutoff cock, *reset means for resetting said armature to attracted position and said controlling member to operating position,* and *means for preventing the resetting operation of said reset means except when said shutoff cock is closed.*

"2. In a device of the class described, a shutoff valve, *a reset stem mounted for reciprocatory movement,* means adapted to be reset by reciprocatory movement of said

stem and *means cooperable with said stem and movable laterally thereof* when the valve is closed to permit operation of said reset means, said last means being held against lateral movement to prevent operation of said reset means when said valve is open." [Italics not quoted.]

Broadly speaking, the invention of the counts relates to a safety device for controlling the flow of fuel to the burners of gas appliances and the like, for example, a gas water heater. The object is to provide a device including a thermoelectrically controlled valve responsive to the heat generated by a pilot burner (or rather to the current generated by a thermocouple placed adjacent the pilot flame), a shutoff cock, and means for resetting the thermo-electrically controlled valve when closed, as well as means for preventing the resetting of said valve except when the shutoff cock is closed. This arrangement prevents the flow of gas to the main burner of the gas appliance on which the device is used while the pilot burner is extinguished.

It is stated in appellant's brief: "It is particularly important that no gas flow to the main burner until after the pilot burner has been lit. There are two obvious reasons for that. The flow of gas to the main burner is in considerable volume and would result in quickly filling the compartment enclosing that burner with a highly explosive gas-air mixture, causing a serious and often disastrous explosion when it is attempted to reignite the pilot burner. Secondly, if gas is supplied to the main burner at the same time it is supplied to the pilot burner, and the pilot burner is immediately lighted, the gas from the main burner will also be lighted with the risk of serious burning of the user's hand or of setting the user's clothing afire. Those things can happen and have happened, in using defective so-called safety devices of this general type and, profiting by experience, the requirements of the American Gas Association that devices of this type be safe in fact have become increasingly stringent."

The devices of both parties, as described in their respective patents, are quite complicated and comprise many parts. This makes it difficult to describe the devices so that the real crux of the controversy may be easily understood. We think, therefore, that it will promote clarity to reproduce here one of the drawings of each of the parties.

APPELLANT'S DRAWING

APPELLEE'S DRAWING

The questions here raised by appellant (except one question appellant seeks to present which we will discuss later herein) are, judging from the decisions of the tribunals below, the same as those which were presented there. The board's statement of appellant's contentions would therefore seem to be sufficient for the most part for our purposes here, and we quote the following from the board's decision:

"Mantz contends that Jackson has no right to make count 1 for the reason that Jackson does not disclose an armature connected to the controlling member and, further, that Jackson does not disclose structure wherein the resetting means resets the armature to attracted position and said controlling member to operating position.

"As to the first contention, it appears in the structure as disclosed by Jackson that the stem 46 may properly be read as the controlling member as set forth in this count. The armature 47 is mounted on this member and abuts against the shoulder thereon and at all times is maintained in this abutting relationship by the spring 48. It therefore appears that the armature is connected to the controlling member at least as much as that of Mantz who describes a loose connection between the armature 55 and stem 57. The mere statement of connection in the count is not deemed to require a rigid connection and, in fact, such rigid connection is not disclosed by either party.

"As to the second ground, Mantz contends that the resetting means consisting of Jackson's bell crank 41 and the actuating cam 43 does not reset Jackson's controlling member to operating position but that instead the spring 48 is the actuating means which causes the armature to move to attracted position. It is to be noted, however, that the spring 48 cannot act to move the armature 47 and the controlling member 46 until the bell crank 41 is moved to reset position by the cam 43. Accordingly it is believed that Jackson fully discloses reset means for resetting the armature to attracted position and the controlling member to operative position.

"With respect to count 2 Mantz contends that Jackson does not disclose reset means which moves laterally of the reset stem or that the means is held against lateral movement. In the device of Jackson it is deemed proper to refer to the member 46 as the reset stem. We further deem that the statement 'lateral movement' can only be interpreted as movement in a direction generally perpendicular to the axis of the stem. Under such an interpretation the end of bell crank 41 moves laterally of the stem 46 as does also the cam member 43 when the control means 9 is turned and either of these members could be termed ressetting means as defined in the count and, since we deem that both members move laterally of the reset stem, Jackson fully supports the first mentioned limitation of count 2.

"Mantz contends that in the Jackson device the reset means is not held against lateral movement by reason of the fact that when operation of the control 9 is prevented by actuation of the lever 78, the member 41 still may be moved. This is probably true if the device is not operated in the manner intended and if it is tampered with by some means to pry the lever 41 away from the control 9. However, we do not deem that the count is so restricted as to define the preventing of operation even by unauthorized tampering. In any event, the cam member 43 is positively prevented from lateral movement under any conditions when the main valve is in open position and the lever 78 has thus been actuated."

It will be observed that we have concurring opinions by the Primary Examiner and the Board of Interference Examiners relating to a subject matter which is highly technical in character, and we think the principle that under such circumstances appellant is under a heavy burden to show that the concurring decisions are erroneous applies here. Jardine v. Hartog, 36 F.2d 606, 17 C.C.P.A., Patents, 764; In re Demarest, 38 F.2d 895, 17 C.C.P.A., Patents, 904; Angell v. Morin, 69 F.2d 646, 21 C.C.P.A., Patents, 1018.

Appellant in this court urges that in order for both counts to read upon Jackson's disclosure, elements thereof must be regarded as responding to certain limitations in one count and yet regarded as being other and different elements when the other count is under consideration. For instance, Mantz states:

"In the Mantz patent, the controlling member is the safety shutoff valve 62, and the reset stem 106 is separate and distinct from and in no way connected to valve 62. How then can these counts be construed,

in accordance with the disclosure of the Mantz patent, as they must be, so that one element (rod 46 of Jackson) becomes two— the controlling member in one case and the reset stem in the other case? It is submitted that such liberal interpretation of the counts is not permissible.

"If the rod 46 of Jackson is the "controlling member" of Count 1, it cannot be the "reset stem" of count 2, since the function of the reset stem of the Mantz patent is to reset the controlling member, and the rod 46 of Jackson cannot reset itself. Nor does rod 46 reset anything. * * *"

We think that, in view of the statement of appellant's contentions set out by the board, the foregoing quotation from appellant's brief illustrates the nature of the controversy between the parties and that all the arguments made by appellant to sustain his position that Jackson has no right to make the counts need not be enumerated here.

Appellant has here stressed with great earnestness the following: "The counts are clear on their face. *There is no ambiguity about them;* and, if they needed construction, they would have to be construed according to the Mantz disclosure." [Italics not quoted.]

If there is no ambiguity and no need for construction, and if the counts broadly read upon the Jackson disclosure, it is not seen how it can logically be urged that there is any necessity for confusing the issues by considering the many contentions which appellant makes with respect to what the language means in his patent. See Shultz v. Dunham, 67 F.2d 501, 21 C.C.P.A., Patents, 706; Bechtold v. Lanser, 82 F.2d 415, 23 C.C.P.A., Patents, 1051; Frey v. Wagner, 87 F.2d 212, 24 C.C.P.A., Patents, 823; and Holdsworth v. Goldsmith, 129 F.2d 571, 29 C.C.P.A., Patents, 1047. Compare Field v. Stow, 49 F.2d 840, 18 C.C.P.A., Patents, 1437; Sweetland v. Cole, 53 F.2d 709, 19 C.C.P.A., Patents, 751; Hansgirg v. Kemmer, 102 F.2d 212, 26 C.C.P.A., Patents, 937, and cases there cited.

Under the circumstances, we think that we and the tribunals below are justified in accepting appellant's admission that there is no ambiguity in the disputed limitations regardless of whether, under other circumstances, we might be called upon to determine whether or not the controverted limitations involve language which is ambiguous and of indefinite and uncertain meaning.

It is clear to us, as it was to the tribunals below, that when the counts are interpreted broadly (and we must so interpret them) they read upon the Jackson structure in the manner pointed out by the board. It is a fact that with respect to count 1 the board relied upon a certain element of the Jackson disclosure as meeting a certain limitation of that count, while in considering count 2 the same element was relied upon as meeting an entirely different limitation. However, we have no reason to believe that the board erred in this respect, since the question with which it was concerned (and with which we are concerned here) was the determination of whether or not the counts broadly read upon the Jackson disclosure. It is true, and we think it is obvious to all concerned, that the involved counts contain language that may be regarded as somewhat inappropriate in describing the Jackson device. Nevertheless, this situation cannot be prevented where the counts are broad and read on Jackson's structure.

We agree with the tribunal appealed from in each of its findings with respect to Mantz's contentions. Since it would only extend this opinion unnecessarily to restate them, and since we have quoted the board's opinion in extenso, we think it sufficient for the purposes of our decision to state that the views expressed by the board with respect to the contentions of Mantz meet with our full approval.

But one other argument requires attention here. Appellant argues at great length that it should not be held that Jackson has the right to make the counts for the reason that the invention claimed in the original Jackson patent is not the invention of the involved counts. Mantz has analyzed the original claims of the Jackson patent and attempted to point out in what respects they relate to an invention wholly different from the one at bar, urging that the term "means for preventing resetting except when the gas cock is closed" is the "vitalizing feature of the Mantz invention and an essential element of each of the claims in issue," and that this feature was not covered by the original claims in the Jackson patent. For this reason, appellant urges that Jackson is estopped to claim the invention of the counts by reissue and has cited Jenks v. Knight, 90 F.2d 654, 24 C.C.P.A., Patents, 1227; Avery v. Chase, 101 F.2d 205, 26 C.C.P.A., Patents, 823; and Bechtold v. Lanser, supra, in support of his argument

that the question of estoppel is ancillary to the question of priority and a proper matter for our consideration.

 We cannot consider this question for two reasons. First, questions of patentability are matters for ex parte consideration in the Patent Office and are not ancillary to priority. Brogden v. Slater, 40 F.2d 988, 17 C.C.P.A., Patents, 1240; Dreyfus v. Lilienfeld, 49 F.2d 1062, 18 C.C.P.A., Patents, 1539; Herthel et al. v. Dubbs, 65 F.2d 138, 20 C.C.P.A., Patents, 1128; Hess v. Dreyfuss, 104 F.2d 801, 26 C.C.P.A., Patents, 1407; and Scheinman v. Zalkind, 112 F.2d 1017, 27 C.C.P.A., Patents, 1354. The cases cited by appellant on the contention with respect to estoppel involved altogether different factual situations and are not in point here. And second, if we were in error in this regard, though we feel sure that the law is too well settled to admit of conflicting views, we could not consider the question because no reason of appeal has been assigned which brings this question here for consideration. In this jurisdiction we are limited by statute to the questions raised by the reasons of appeal. R.S. § 4914, 35 U.S.C.A., § 62. Moreover, appellee states, and it is not denied, that this subject matter was not considered by the tribunals below. Certainly the decisions of the tribunals below do not disclose that either of them gave any consideration to this phase of the controversy.

Holding as we do that both counts read upon Jackson's disclosure and this being the only question involved in the case which we need consider, the decision of the Board of Interference Examiners should be, and is, affirmed.

Affirmed.